
UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| CHRISTOPHER KEATING, | * | CIV 04-4208 |
| Plaintiff, | * | |
| -vs- | * | MEMORANDUM OPINION AND ORDER |
| UNIVERSITY OF SOUTH DAKOTA, JAMES ABBOTT, ROYCE ENGSTROM, DONALD DAHLIN, MATTHEW MOEN, TIMOTHY HEATON, CHRISTINA KELLER, SOUTH DAKOTA BOARD OF REGENTS, MIKE ROUNDS, | * | |
| Defendants. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Pending before the Court is Defendants' motion for summary judgment, Docket 84. Plaintiff Christopher Keating filed two responses in opposition to the motion, and Defendants have submitted a reply brief. The summary judgment motion will be granted in part and denied in part for the reasons set forth below.

## DECISION

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c)(1); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Once the moving party has met its burden, the non-moving party may not rest on

the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 257; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273-74 (8th Cir. 1988).

In the present case, Keating's employment contract with the University of South Dakota was not renewed based on his alleged lack of civility pursuant to the COHE agreement. Keating asserts claims under 42 U.S.C. § 1983, contending that Defendants' actions deprived him of his right to engage in free speech which is protected under the First Amendment to the United States Constitution, and that the civility clause of the COHE agreement is unconstitutionally vague or overbroad.

Defendants argue that the Eleventh Amendment affords them immunity from suit in federal court, and they also assert that they are entitled to judgment on the merits of Keating's claims even if they are not entitled to immunity. The background and relevant facts which are recited in the court's previous Memorandum Opinions, Dockets 43, 53 and 73, are not in dispute and will not be repeated here. For ease of reference, the email that led to the nonrenewal of Keating's contract will be set forth below, along with the civility clause of the COHE agreement.

On April 24, 2004, Keating sent an email to Dr. Heaton. Keating describes the email as a private email between Dr. Heaton, Dr. Keller and himself, which was shared with no one else, and was in direct response to an email sent by Dr. Heaton to Keating. Docket 1 at p. 3. Keating's email states, in part:
> On the other hand, I did come to you with my problems and the result was highly unsatisfactory. You came back and insisted that not only did I not have anything to complain about, but everything except the price of corn futures was my fault. We will ignore the fact the two are mutually exclusive. How could I be at fault for everything when you already concluded there was nothing wrong? You and Dr. Keller took this matter out of the department and made it a school-wide problem. You did nothing to address my problems except to tell me that I was essentially not part of the department. You two then threatened me with false charges of sexual harassment and stated in your letter that I had engaged in inappropriate behavior.

> I came to you with a problem and you made it infinitely worse. Your actions have caused permanent damage to my relationship with the two of you. There is no way I can trust you with another problem.
>
> I cannot communicate with Dr. Keller because she is a lieing (sic), backstabbing sneak. I ask her questions and she will not answer. She learns important information and she withholds it. She keeps a secret file on me that she pulls out to use against me. She then talks badly about me around campus.

Docket 1 at p. 2-3.

Keating's language was found to be in violation of the civility clause in the employment contract between the University of South Dakota and its faculty, as represented by the Council of Higher Education (COHE). Appendix G of the COHE Contract is entitled "Statement Concerning Faculty Expectations." Docket 86 at ¶ 2. The civility provision is contained within that Appendix and is entitled "Civility in working with colleagues, staff members, students and others." *Id.* at ¶ 3. It provides:

> Universities play a special role in preparing students to lead the complex social organizations through which businesses and professions operate and through which free people govern themselves. Students must be taught, and they must be shown through the example given by institutional employees, that members of stable, effective and prosperous social organizations observe norms of conduct under which all participants treat one another civilly and carry out their respective tasks in a constructive and informed manner. Complex social organizations derive their strength from the cooperation of those who participate in them. By virtue of their special role in preparing future generations of leaders, universities have a particular concern with conduct that destroys the bonds of cooperation and common purpose on which society rests by demeaning members of the community, and such conduct cannot be tolerated in an institution whose very purpose is to shape the skills and conscience of the rising generations.
>
> Faculty members are responsible for discharging their instructional, scholarly and service duties civilly, constructively and in an informed manner. They must treat their colleagues, staff, students and visitors with respect, and they must comport themselves at all times, even when expressing disagreement or when engaging in pedagogical exercises, in ways that will preserve and strengthen the willingness to cooperate and to give or to accept instruction, guidance or assistance.

Docket 87-1 at p. 2.

3

## I. Eleventh Amendment Immunity

The Eleventh Amendment of the United States Constitution provides that:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against any one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. Amend. XI. The Amendment has been interpreted to protect an unconsenting "State or one of its agencies or departments" from suit in federal court by its own citizens as well as those of another state. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). The Supreme Court has recognized two exceptions to the Eleventh Amendment immunity for the States and their agencies.

While this immunity from suit is not absolute, we have recognized only two circumstances in which an individual may sue a State. First, Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment-an Amendment enacted after the Eleventh Amendment and specifically designed to alter the federal-state balance. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Second, a State may waive its sovereign immunity by consenting to suit. *Clark v. Barnard*, 108 U.S. 436, 447-448, 2 S.Ct. 878, 27 L.Ed. 780 (1883).

*College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999).

### A. University of South Dakota and Board of Regents

The University of South Dakota and the Board of Regents argue that they are arms of the state and they have not waived their Eleventh Amendment immunity from suit in federal court. In support of that argument, Defendants assert that the University of South Dakota is a state-funded institution of higher learning. *See* SDCL §§ 13-51-4 (duty of Board of Regents to make recommendations to state legislature regarding support of institutions of higher education); 13-55E-1 (term "institution of higher education" includes any state-supported university). The Board of Regents governs the University of South Dakota. *See* SDCL § 13-49-1 (control of state institutions of higher education vested in Board of Regents). Members of the Board of Regents are appointed by the Governor with the consent of the Senate. *See id.* An educational fund has been established

in the state treasury to support the institutions of higher education under the jurisdiction of the Board of Regents, *see* SDCL § 13-51-2, and the state treasury is to receive all funds arising from the educational institutions governed by the Board of Regents, *see* SDCL § 13-53-15.

Keating counters that the Board of Regents is a political entity separate from the state because, among other things, it can acquire property, *see* SDCL § 13-51A-2, and issue bonds, *see* SDCL § 13-51A-13. Keating contends that there are no state funds at risk from an adverse decision in this case. According to Keating, the University of South Dakota, by extension, also does not qualify for immunity.

The Eighth Circuit and the South Dakota Supreme Court have held that the Board of Regents is a political subdivision of the state and, as such, is entitled to sovereign immunity, meaning that it cannot be sued under § 1983. *See Prostrollo v. Univ. of S.D.*, 507 F.2d 775, 777 n. 1 (8th Cir. 1974) ("it is fundamental that the University of South Dakota and the corporate body constituting the Board of Regents, both political subdivisions of the state, may not be sued under the Civil Rights Act since neither entity constitutes a 'person' within the meaning of § 1983") (citations omitted); *Aase v. State, S.D. Bd. of Regents*, 400 N.W.2d 269, 271 (S.D. 1987) (holding "that the Board of Regents is not a person within the meaning of 42 U.S.C. § 1983 ... and may not be sued under that section") (citations omitted); *Kringen v. Shea*, 333 N.W.2d 445, 446 (S.D. 1983) ("sue and be sued" clause does not change Board of Regents' entitlement to sovereign immunity). Keating has not offered information sufficient to contradict the holdings in these cases.

In addition, a case decided in the District of South Dakota found that the South Dakota Board of Regents is an arm of the state and thus is immune from suit under the Eleventh Amendment. *See South Dakota Bd. of Regents v. Hoops*, 624 F.Supp 1179 (D.S.D. 1986) (analyzing the Board's relationship with the state, including the Board's lack of financial autonomy). The *Hoops* case and the statutes cited above show that funds to satisfy a judgment against the Board of Regents in this case would come from the state's coffers, and Keating has offered no contrary argument. The court

concludes that the Board of Regents is protected by the Eleventh Amendment from suits in federal court.

The Board of Regents controls the University of South Dakota and, thus, the University is also entitled to immunity. *See Prostrollo*, 507 F.2d at 777 n. 1 (reasoning that the University of South Dakota, which the Board of Regents controls, cannot be sued under § 1983).

For these reasons, the Board of Regents and the University of South Dakota, as arms of the state, are protected under the Eleventh Amendment from Keating's First Amendment free speech claim seeking monetary damages, as well as his claim for an injunction against enforcement of the civility clause. *See Monroe v. Arkansas State University*, 495 F.3d 591, 594 (8th Cir. 2007) (states and state agencies are entitled to Eleventh Amendment immunity from suits for any kind of relief, including prospective injunctive relief and monetary damages). Defendants' motion for summary judgment must be granted as to the Board of Regents and the University of South Dakota.

### B. Individual Defendants

Defendants argue that the individually-named defendants, Abbott, Engstrom, Dahlin, Moen, Heaton, Keller, and Governor Rounds, are entitled to Eleventh Amendment immunity. Officials of a state entity entitled to Eleventh Amendment immunity are also entitled to Eleventh Amendment immunity from claims for monetary damages against them in their official capacities. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). This is because a suit against a government official in his or her official capacity is "another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Social Services*, 436 U.S. 658, 690 n. 55 (1978). "[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official . . . ." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). On the other hand, the Eleventh Amendment does not prevent a plaintiff from seeking damages from a state official if he sues the official in his or her personal capacity. *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 619 (8th Cir. 1995). If the complaint is silent as to the capacity in which the individual is sued, an official capacity suit is assumed. *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). As the Eighth

Circuit has explained, public servants are entitled to proper notice that they may be exposed to civil liability and damages. *Id.*

There is no dispute that Keating's complaint is silent as to the capacity in which the individually-named defendants are sued. In his response to Defendants' motion for summary judgment, Keating explains:

> Plaintiff is asserting Defendants acted in their official capacities in a manner that violated federal and Constitutional law outside the purview of their offices. Thus, the complaint is against the Defendants in both their personal and official capacities.

Docket 89, p. 7. A statement made in response to a motion is not sufficient notice of a personal capacity lawsuit. *See Egerdahl*, 72 F.3d at 620. Furthermore, allowing Keating to amend his complaint to assert a personal capacity claim at this late stage of the litigation would be very prejudicial to the defendants. For these reasons, defendants Abbott, Engstrom, Dahlin, Moen, Heaton, Keller, and Governor Rounds are entitled to Eleventh Amendment immunity from Keating's claims for monetary damages.

## II. Qualified Immunity

Even if Keating were allowed to amend his complaint to sue the individual defendants in their personal capacities, the defendants would be entitled to qualified immunity because Keating was not speaking on a matter of public concern.

In a § 1983 personal-capacity claim, the plaintiff seeks to hold a government official personally liable for actions taken under the color of law. *Clay v. Conlee*, 815 F.2d 1164, 1169 (8th Cir. 1987). A government official sued in his personal capacity may raise the defense of qualified immunity. Under the doctrine of qualified immunity, state actors are protected from civil liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1999).

7

The Eighth Circuit explained that the qualified immunity inquiry is a two-step process: (1) determining whether "plaintiffs have asserted a violation of a constitutional or statutory right"; and (2) determining whether "that constitutional right was clearly established at the time that the plaintiffs were discharged." *Sexton v. Martin*, 210 F.3d 905, 909 (8th Cir. 2000). A right is clearly established if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal quotation marks and citations omitted). With his claim that Defendants violated his First Amendment right to freedom of speech, Keating has asserted a violation of a constitutional right.

The second step in the qualified immunity inquiry is to determine whether Keating's free speech right was clearly established at the time his contract was not renewed. *See Sexton*, 210 F.3d at 910. To determine if Keating's free speech right was clearly established, the court must determine whether his speech touched on matters of public concern. *See id.*

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context" of the speech, and the speech must relate to some "matter of political, social or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146, 147-48 (1983). The Eighth Circuit has explained its interpretation of *Connick's* "public concern" requirement:

> Where a public employee speaks out in public or in private on matters that relate solely to the employee's parochial concerns as an employee, no first amendment interests are at stake .... The focus is on the role the employee has assumed in advancing the particular expressions: that of a concerned public citizen, informing the public that the state institution is not properly discharging its duties, or engaged in some way in misfeasance, malfeasance or nonfeasance; or merely as an employee, concerned only with internal policies or practices which are of relevance only to the employees of that institution.

*Cox v. Dardanelle Public School Dist.*, 790 F.2d 668, 672 (8th Cir. 1986) (footnote and citations omitted). "The public concern test functions both to prevent every employee grievance from becoming a constitutional case, and to protect a public employee's right as a citizen to speak on issues of concern to the community." *Tindle v. Caudell*, 56 F.3d 966, 971 (8th Cir. 1995) (citing

*Connick*, 461 U.S. at 146-47, 149). Statements that are purely job-related and statements dealing with personnel matters generally are not protected speech. *Buazard .v Meridith*, 172 F.3d 546, 548 (8th Cir. 1999); *Shands v. City of Kennett*, 993 F.2d 1337, 1343 (8th Cir. 1993). "When focusing on the employee's role, we consider whether the employee attempted to communicate the speech to the public at large and the employee's motivation in speaking." *Bausworth v. Hazelwood School Dist.*, 986 F.2d 1197, 1198 (8th Cir. 1993).

In ruling on the motion for a preliminary injunction, this court held that Keating's speech does not address a matter of public concern. Docket 43 at p. 10-11. Keating has not presented any additional evidence or argument to change that determination. His allegations in the complaint that the speech was in a private email between Drs. Heaton and Keller and himself, that it was shared with no one else, and that it was in direct response to an email sent by Dr. Heaton, all support the court's conclusion that the speech is private. *See Buazard*, 172 F.3d at 549 (internal nature of the plaintiff's statements and his role as employee in making the statements indicate speech was not a matter of public concern). In addition, the content of the message conveyed by Keating's speech is one of frustration relating to an individual personnel dispute or grievance, and the speech is directed at a private effort rather than any effort to educate the public about the functioning of the University. Simply put, Keating is complaining of a poor working relationship with his superiors and his speech does not relate to a matter of political, social, or other concern to the community. Accordingly, even if Keating could sue the individually-named defendants in their personal capacities, they are entitled to qualified immunity, which protects them from civil liability and damages for Keating's First Amendment free speech claim, because Keating's constitutional right to free speech was not clearly established.

### III. Merits of Overbreadth and Vagueness Claims

Defendants acknowledge that Keating can seek prospective injunctive relief to abate a continuing violation of federal law by a state official acting in his official capacity. Therefore, although qualified immunity bars Keating from seeking damages against the individual defendants, Keating can seek an injunction prohibiting them from enforcing the civility clause if it is found to be

overbroad or vague. *See, e.g., Treleven v. University of Minnesota*, 73 F.3d 816, 819 (8th Cir. 1996) (state's Eleventh Amendment immunity does not shield official from prospective injunctive relief); *Grantham v. Trickey*, 21 F.3d 289, 295 (8th Cir. 1994) (qualified immunity does not shield officials from equitable relief). Defendants argue that they are entitled to summary judgment on the merits of Keating's overbreadth and vagueness claims.

### A. Overbreadth

Keating claims the civility clause is unconstitutionally overbroad because it bans and punishes a broad range of speech, including that which is protected by the First Amendment. Defendants respond that the civility clause has minimal, if any, impact on protected speech because it does not prevent professors from commenting on any particular matter, including matters of public interest as citizens. Rather, it only requires professors to be respectful while conducting themselves as employees.

Overbroad restrictions on speech are those that sweep within their scope a "substantial" amount of constitutionally protected speech "judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (a law may be invalidated as overbroad if "a substantial number of its applications are unconstitutional) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n. 6 (2008)); *see also Excalibur Grp., Inc. v. City of Minneapolis*, 116 F.3d 1216, 1224 (8th Cir. 1997) ("To be facially invalidated under this doctrine, the overbreadth of an ordinance affecting both conduct and pure speech must be both 'real' and 'substantial' in relation to its 'plainly legitimate sweep.'") (quoting *New York v. Ferber*, 458 U.S. 747, 769–70 (1982)). The overbreadth doctrine is "strong medicine" to be used "sparingly." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 615 (1973).

Much of the language in the civility clause seeks to advise faculty members of the University's ideals, but some language could chill speech that is protected by the First Amendment. Requiring faculty members to discharge their duties "civilly," to treat one another "civilly" and with "respect," and prohibiting conduct that is "demeaning" to members of the community, could encompass

protected speech. Mandating that faculty members express disagreement "in ways that will preserve and strengthen the willingness to cooperate and to give or to accept instruction, guidance or assistance" could hinder protected speech. For example, if the university determined that words used by a professor to criticize the administration on matters of public concern were uncivil, disrespectful, demeaning or uncooperative, the professor might be punished by university officials for engaging in speech that is constitutionally protected.[1] That possibility is not enough, however, to invoke the overbreadth doctrine to strike down the civility clause. *See, e.g., Tindle v. Caudell*, 56 F.3d at 973 ("[T]he ability to conceive of hypothetical problematic applications does not render the rules susceptible to an over-breadth challenge."). Invalidation is appropriate only if the policy is substantially overbroad in relation to its "plainly legitimate sweep." Here, the application of the civility clause to Keating's speech did not run afoul of the constitution, and the Court can envision many other circumstances where the policy could be constitutionally applied to unprotected speech. The Court concludes that the civility clause is reasonably interpreted as reaching substantially more unprotected than protected speech. Any possible application of the civility clause to protected speech in violation of the First Amendment "can still be remedied through as-applied litigation." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003).

Because Keating has failed to demonstrate that the civility clause's application to protected speech is "substantial" relative to its constitutional applications, the court will decline to use the "strong medicine" of overbreadth to invalidate the clause, and Defendants are entitled to summary judgment on Keating's overbreadth claim.

---

[1] The Eighth Circuit has held that teachers' speech can be protected even if it is critical of administrative policies and practices. *See, e.g., Cox v. Dardanelle Sch. Dist.*, 790 F.2d 668, 673 (8th Cir. 1986) (teacher's speech criticizing her school district's personnel policies touching upon matters that affected the educational functioning of the school were matters of public concern entitled to First Amendment protection); *Lewis v. Harrison School Dist. No. 1*, 805 F.2d 310, 316 (8th Cir. 1986) (principal's speech to school board criticizing superintendent's decision to transfer principal's wife from high school to junior high was matter of public concern).

**B. Vagueness**

Keating argues that prohibiting speech considered to be "uncivil" without a definition of what constitutes "uncivil" renders the civility clause unconstitutionally vague. According to Keating, the term "uncivil" fails to give fair notice as to the behavior which is prohibited and fails to provide standards for officials enforcing the policy. Keating further asserts that a person of common intelligence reading the policy would not be put on notice of the prohibited conduct.

Defendants respond that the civility clause is not unconstitutionally vague even though it does not define the term "uncivil." According to Defendants, the civility clause is part of an agreement that establishes expectations for professors, as employees, to conduct themselves civilly, in a manner that is not demeaning. Defendants say, "The parameters of acceptable behavior are reasonably ascertainable by reviewing the clause as a whole in the context of it being one part of the employment agreement." Docket 88 at p. 19.

The Eighth Circuit has held that, "[t]o 'survive a vagueness challenge, a statute must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and provide explicit standards for those who apply the statute.'" *United States v. Dinwiddie*, 76 F.3d 913, 924 (8th Cir. 1996) (quoting *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 689 (8th Cir. 1992)).

The Eighth Circuit further explained:

A vague regulation is constitutionally infirm in two significant respects. First, the doctrine of vagueness "incorporates notions of fair notice or warning," *Goguen*, 415 U.S. at 572, 94 S.Ct. at 1247, and a regulation "violates the first essential of due process of law" by failing to provide adequate notice of prohibited conduct. *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926) (citations omitted). In short, a regulation is void-for-vagueness if it "forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application...." *Id.* Second, the void-for-vagueness doctrine prevents arbitrary and discriminatory enforcement. *Goguen*, 415 U.S. at 573, 94 S.Ct. at 1247. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and

subjective basis...." *Grayned v. City of Rockford*, 408 U.S. 104, 108-109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972).

*Stephenson v. Davenport Community School District*, 110 F.3d 1303, 1308 (8th Cir. 1997).

The rule in question fails in both respects. It is an aspirational statement but it forbids acts in terms so vague that persons must necessarily guess at the meaning of the rule and differ as to its application. "Civilly" is not defined. What may not be viewed as "civil" by one person may only be spirited speech to another person in an academic setting. There is no fair notice or warning from the rule of proscribed conduct that could, for example, lead to the loss of one's employment. Secondly, the rule in question does not provide explicit standards for those who apply the rule. Such explicit standards can prevent arbitrary and discriminatory enforcement.[2] There are no such explicit standards in the present rule.

Freedom of thought and speech are the hallmarks of a University. Where there are restrictions upon free speech in such an institution, there must be some specific guidance to both the speakers and the rule enforcers on the limitations on free speech. This civility rule is unconstitutionally vague for a university.[3] Accordingly,

> IT IS ORDERED that Defendants' motion for summary judgment, Docket 84, is granted except that declaratory judgment is granted in favor of the Plaintiff and against the individually-named Defendants to the extent that the portion of Appendix G "Statement Concerning Faculty Expectations" of the COHE Contract entitled "Civility in working with colleagues, staff members, students and others" is unconstitutional for its vagueness. Summary judgment is granted in favor of the

---

[2] There was no finding of arbitrary and discriminatory enforcement in this case.

[3] The rules applicable to police officers in *Tindle v. Caudell*, 56 F.3d 966 (8th Cir. 1995) were more specific than the undefined civility requirement of the University. In addition, the *Tindle* court in finding the police department rules under which the office was disciplined to not be unconstitutionally over broad or vague, observed that "Because police departments function as para-military organizations, their members may be subject to stringent rules and regulations that could not apply to other government agencies." *Tindle* at 973.

13

Defendants as to the remainder of the declaratory judgment claims and as to all other claims.

Dated this 30th day of September, 2013.

BY THE COURT:

/s/ Lawrence L. Piersol
Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: /s/ Deb Petals
(SEAL)     DEPUTY